IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| BLEACHER CREATURES, LLC, | : | Case No. 17-13162 (JKF) |
| | : | |
| Debtor.[1] | : | |
| | : | |

**MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION FOR ENTRY OF
INTERIM AND FINAL ORDERS (I) AUTHORIZING, BUT NOT DIRECTING,
PAYMENT OF PREPETITION CLAIMS OF
CERTAIN CRITICAL VENDORS; AND (II) GRANTING RELATED RELIEF**

Bleacher Creatures, LLC, debtor and debtor in possession in the above-captioned case (the "Debtor"), hereby moves the Court for entry of interim and final orders authorizing the Debtor to pay certain undisputed, prepetition claims of certain critical vendors, subject to the conditions described herein, and scheduling a final hearing on the relief requested herein (the "Motion"). In support of this Motion, the Debtor respectfully represents as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief sought herein are sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] The last four digits of the Debtor's federal tax identification number are (4547). The principal place of business of the Debtor is 527 Plymouth Road, Suite 407, Plymouth Meeting, Pennsylvania 19462.

10131068

# BACKGROUND

**I.     Overview of the Debtor's Business.**

4.      The Debtor is a Delaware limited liability company with its principal place of business in Plymouth Meeting, Pennsylvania. The Debtor was formed in 2011.

5.      The Debtor is in the business of manufacturing, distributing, and selling plush toys that resemble popular athletes, sports mascots, public figures, and characters from movies, comics, and other popular media. The Debtor sells most of its products under licenses from organizations such as Major League Baseball, the National Football League, the National Basketball Association, the National Hockey League, Disney, Marvel Comics, and DC Comics, among others. Certain of its products, including likenesses of historical figures and individuals in the public domain, are able to be sold without a license.

6.      The Debtor engages factories located in China to manufacture its products, and employs shippers and logistics companies to transport finished goods either directly to the customer or to be warehoused in California pending their sale. The Debtor sells its products in the United States and internationally. The Debtor derives most of its revenue from wholesaling its products to retailers such as Target, Toys "R" Us, and Sears, among others, who re-sell the products to consumers. Additionally, approximately 4% of the Debtor's sales are direct-to-consumer sales through the Debtor's online sales platforms. The primary end consumers of the Debtor's products are children and memorabilia collectors.

**II.    The Debtor's Need for Protection Under Chapter 11 of the Bankruptcy Code.**

7.      Like other companies that depend ultimately upon retail sales, the Debtor has faced numerous obstacles recently. First, the general difficulties of the current challenging retail market have been compounded by the terms of certain of the Debtor's licenses, which require the Debtor to make minimum guaranteed payments to certain licensors, irrespective of actual sales

of the licensed product. At the same time, certain of the Debtor's licensors recently prohibited the Debtor from selling their licensed products on Amazon.com, which had historically proven to be a lucrative sales platform for the Debtor. These pressures have caused the Debtor to experience significant liquidity constraints for well over a year.

8. Additionally, beginning in 2014, the Debtor attempted to expand its direct-to-consumer sales through the use of mall kiosks. This strategy did not result in the sales volume the Debtor had expected, while at the same time burdening the Debtor with additional expenses.

9. Due to these issues, among others, the Debtor began exploring strategic alternatives in January 2016. The Debtor engaged Gregory Weinberg of GMW Organization, LLC ("GMW") as its investment banker to market a potential sale, merger, or other transaction that would maximize the going concern value of the Debtor's business. From February through May of 2016, GMW contacted approximately 10 potential counterparties. Those contacts resulted in meetings or calls with no less than six potential strategic partners. Each of these six parties entered into nondisclosure agreements, and certain entered into prolonged discussions, but none entered into a transaction. Around May 2016, however, the Debtor experienced an upward trend in sales, which prompted a current investor and member of the Debtor's board, Arrow Promotional Group, LLC ("Arrow"), to make a $200,000 unsecured loan to the Debtor in an effort to stabilize the business.

10. Despite the brief turnaround, the Debtor's sales began to decline in October 2016, and the Debtor required additional liquidity. That month, the Debtor's management proposed a merger of the Debtor and Pangea Brands (an affiliate of Arrow) to capture certain synergies and cost savings that a combined entity could expect to realize. The proposed merger did not come to fruition.

11. Sales continued to decrease, producing poor results for the fourth quarter of 2016. Following the failed merger with Pangea, the Debtor worked to identify investment and sale opportunities with existing investors. Again, nothing materialized, due in part to the Debtor's poor fourth quarter performance.

12. In January 2017, the Debtor's management recommended to the board that the Debtor should cease operations by the end of February 2017 unless new capital could be raised or a merger with Pangea Brands approved. In response, the Debtor's board voted to approve a merger with Pangea, subject to certain conditions and the receipt of approvals from certain licensors. Although the Debtor and GMW made significant efforts to satisfy such conditions and obtain the necessary approvals, these prerequisites for closing the merger have not been met, and the merger has been put on hold and is highly unlikely to close.

13. In March of 2017, the Debtor declined to renew its licenses with Marvel and the NFL because the Debtor lacked sufficient capital to pay the approximately $200,000 in advance payments due on renewal.

14. Throughout March and April of 2017, the Debtor laid off a significant portion of its workforce in an effort to reduce costs.

15. In late April 2017, Arrow—the investor and board member who made a $200,000 unsecured loan to the Debtor approximately a year ago—proposed a transaction in which a newly formed entity, Bleacher Acquisition, LLC (the "Stalking Horse"), would acquire certain of the Debtor's assets and assume certain of the Debtor's liabilities through a sale under section 363 of the Bankruptcy Code. Arrow asked that the Debtor's current President, Matthew S. Hoffman, participate as an equity holder in the Stalking Horse and serve as an executive of the post-

bankruptcy acquiring entity, should the Stalking Horse's offer prevail as the highest and best offer for the Debtor's assets at a final hearing on the Debtor's sale motion.

16. Around the same time, at the direction of the Debtor's management, GMW re-canvassed the market for potential third-party buyers, merger partners, or investors who might provide the Debtor with the capital necessary to continue as a viable going concern. GMW contacted approximately five parties. To date, no third party has proposed transaction likely to yield more return for the Debtor's creditors than the offer of the Stalking Horse.

17. The Debtor commenced the above-captioned chapter 11 case on May 2, 2017 (the "Petition Date"). The purpose of this case is to permit the Debtor's business to continue as a viable going concern while the Debtor attempts to consummate a sale transaction, either to the Stalking Horse or to any other purchaser who may present a higher or better offer for the Debtor's assets.

18. The Debtor continues to operate its business and manage its assets as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

19. To date, no trustee or official committee of unsecured creditors has been appointed or designated by the Office of the United States Trustee.

**RELIEF REQUESTED**

20. By this Motion, the Debtor seeks entry of an interim order (attached hereto as Exhibit A) and final order (attached hereto as Exhibit B) granting authority to pay the agreed amount of certain undisputed, prepetition claims (the "Critical Vendor Claims") of certain critical suppliers of goods and services with whom the Debtor continues to do business and whose goods and/or services are essential to the Debtor's continued operations (the "Critical Vendors"), as more particularly described and on the terms set forth below. Subject to the terms

set forth below, and to the extent possible, the Debtor proposes to condition the payment of Critical Vendor Claims on the agreement(s) of individual Critical Vendors to continue supplying goods and services to the Debtor on the same trade, or better, trade terms than such Critical Vendors offered the Debtor within the six months before the Petition Date, or pursuant to such other trade practices and programs that are favorable to the Debtor in its discretion. The Debtor reserves the right to negotiate new trade terms with any Critical Vendor as a condition to payment of any Critical Vendor Claim.

21. The Debtor estimates that the aggregate amount of payments to be made on account of Critical Vendor Claims is approximately $85,000. The Debtor seeks entry of an interim order authorizing, but not directing, it to pay Critical Vendors in an amount not to exceed $60,000 (the "Interim Critical Vendor Cap") in the interim period. At the final hearing on this Motion (the "Final Hearing"), the Debtor will seek entry of a final order authorizing, but not directing, it to pay Critical Vendors in an amount not to exceed $85,000 (the "Final Critical Vendor Cap,") and together with the Interim Critical Vendor Cap, the "Critical Vendor Cap").

22. In addition, the Debtor seeks interim and final orders authorizing and directing the Debtor's banks to receive, process, honor, and pay all of the Debtor's prepetition checks and fund transfers on account of any Critical Vendor Claim, and prohibiting the Debtor's banks from placing holds on, or attempting to reverse, any automatic transfers to any account of a Critical Vendor or other party for prepetition Critical Vendor Claims.

**BASIS FOR RELIEF**

**I.    Payment of Critical Vendor Claims is Essential to Preserving Going Concern Value.**

23. The Debtor purchases goods and services from certain vendors and contractors whose services are critical to the Debtor's continued operations. Most, if not all, of these Critical Vendors do not have written contracts with the Debtor for this arrangement, may be entitled to

6

administrative priority pursuant to section 503(b)(9) of the Bankruptcy Code, or could not be replaced within a reasonable time and on terms as beneficial to the Debtor as those currently in place. The Debtor believes that payment of the Critical Vendor Claims is vital to the Debtor's ability to preserve and maximize value for all stakeholders pending the sale of its business assets on a going concern basis.

24.     The Debtor expects that its vendors will continue to do business with it after commencement of this case because doing so is appropriate in the Debtor's business judgment. However, in the event any Critical Vendor: (a) refuses to deliver goods or provide services without payment of their prepetition claims; or (b) refuses to deliver goods or provide services on reasonable prices or credit terms absent payment of prepetition claims, the Debtor requests authorization to pay the Critical Vendor Claims of such vendor, in an amount not to exceed the Critical Vendor Cap, subject to the criteria below.

**II.     Stringent Criteria will Be Used to Identify Critical Vendors.**

25.     To ensure that the Debtor identifies as Critical Vendors only those vendors that are actually critical to the Debtor's business, and who will refuse to, or who will demand pricing or trade terms that constitute an effective refusal to, provide goods if not paid, certain of the Debtor's employees who are responsible for maintaining, and have intimate knowledge of, the Debtor's vendor relationships, have conducted, and will continue to conduct, an extensive analysis and review of those relationships.

26.     Toward that end, the Debtor has determined that it will not pay as Critical Vendors those parties that are obligated to perform under executory contracts with the Debtor.

27.     Additionally, the Debtor has used, and will continue to use, the following criteria to determine which of the Debtor's vendors are Critical Vendors: (a) whether the vendor is a sole-source provider; (b) whether the Debtor receives advantageous pricing or other terms from a

7

vendor such that a postpetition replacement would result in significantly higher costs; (c) whether quality or quantity requirements, geographic constraints, customizations, or other specifications prevent the Debtor from obtaining the necessary goods from alternative sources within a reasonable timeframe; (d) whether a vendor has possession of goods, products, or other deliverables as to which they are able to claim a possessory lien and, thus, to decline to deliver such items to the Debtor without payment; or (e) whether a vendor's prepetition claim is entitled to administrative expense status under Bankruptcy Code section 503(b)(9). The Debtor is confident that this process has appropriately identified, and will continue to appropriately identify, only those vendors that are critical to its estate.

**III.    Types of Goods Giving Rise to Critical Vendor Claims Evidences Necessity for Payment.**

28.    Among the types of Critical Vendors identified by the Debtor are certain vendors who manufacture the Debtor's products (including certain products that are currently under order from the Debtor's customers) and perform services necessary to ensure the safety of their products. The Debtor believes that if it fails to pay the Critical Vendor Claims on a timely basis, its existing relationships with such vendors will be negatively impacted, resulting in value loss to the detriment of all stakeholders.

29.    For example, certain of the Debtor's vendors offer web-based services that facilitate the Debtor's internet sales. Other vendors are manufacturing products that have been ordered by, and will be shipped directly to, the Debtor's customers. Others perform testing of the Debtor's products. The loss of these Critical Vendors to the Debtor's estate would cause obvious harm. The Debtor's total revenue generated from those vendors far outweighs the Debtor's payment obligations. The Debtor believes that if the prepetition amounts that are owed to these vendors are not satisfied, such vendors might refuse to continue to supply products to the

Debtor or might refuse to continue to provide the Debtor with advantageous terms. It is essential to maintain the Debtor's value and, moreover, to all stakeholders, that the Debtor avoids losing these essential services and the relationship with these vendors.

30. Vendors of the nature described above, and others that satisfy the criteria described above, fall under the rubric of Critical Vendors. Any refusal by Critical Vendors to provide essential goods would have immediate and severe adverse repercussions, including, but not limited to, jeopardizing or impairing the value of the Debtor's business.

**IV.    Proposed Terms and Conditions for Payment of Critical Vendor Claims.**

31. The Debtor proposes to condition the payment of Critical Vendor Claims on the agreement of the Critical Vendors to provide services to the Debtor on the most favorable trade terms that such Critical Vendor offered to the Debtor in the 6 months before the Petition Date (the "Customary Trade Terms"), or such other terms as may be agreed upon between the parties. Subject to objection rights of the Critical Vendors, if any Critical Vendor accepts payment on account of the Critical Vendor Claims and does not continue to provide postpetition services to the Debtor on Customary Trade Terms, any payments made to such Critical Vendor hereunder may be deemed, in the Debtor's discretion, (i) an avoidable postpetition transfer under section 549 of the Bankruptcy Code and may be recoverable by the Debtor; or (ii) to have been in payment of then-outstanding (or subsequently accruing) postpetition claims of such Critical Vendor without further order of the Court or action by any person or entity. In addition, the Debtor requests that upon any refusal by a third party to release goods being held as security for such party's unsatisfied prepetition claim, the Debtor shall be entitled to seek an expedited hearing, on no fewer than 5 days' notice, to compel the release of such property.

9

**V.    Section 363(b) of the Bankruptcy Code Permits the Payment of Critical Vendor Claims.**

32.    The Court may authorize the Debtor to pay Critical Vendor Claims under section 363(b) of the Bankruptcy Code. Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain prepetition claims. *See, e.g.*, *In re MPC Computers, LLC*, Case No. 08-12667 (PJW) (Bankr. D. Del. Nov. 10, 2008) (authorizing, pursuant to section 363, the payment of prepetition claims of some suppliers); *In re Federated Dep't Stores, Inc.*, 1990 Bankr. LEXIS 122 (Bankr. S.D. Ohio 1990) (authorizing payment of prepetition claims under section 363 of the Bankruptcy Code to employees, customers, and department lessees). The Debtor's decisions to use, sell, or lease assets outside the ordinary course of business must be based on the sound business judgment of the debtor. *See, e.g.*, *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2nd Cir. 1992) (holding that the approval of a 363(b) application must be based on a good business reason).

33.    As discussed more fully herein, the Debtor's request to pay the Critical Vendor Claims meets this business judgment standard because the failure to satisfy the Critical Vendor Claims could have a material adverse impact on the day-to-day operations of the Debtor's business and the value of the Debtor's business as a whole.

**VI.    The Court's Equitable Powers Under Section 105(a) Permits the Payment of Critical Vendor Claims.**

34.    Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under

11 U.S.C. § 105, a court can permit pre-plan payment of prepetition obligations when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing *In re Ionosphere Clubs*, 98 B.R. at 177).

35.     In a long line of well-established cases, federal courts have consistently permitted postpetition payment of prepetition obligations where necessary to preserve or enhance the value of the Debtor's estate for the benefit of all creditors. *See, e.g.*, *Miltenberger v. Logansport Ry.*, 106 U.S. 286 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); *In re Chateaugay Corp.*, 80 B.R. 279 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses and benefits).

36.     The Third Circuit recognized the "necessity of payment" doctrine in *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of prepetition claims if such payment was essential to the continued operation of the debtor.  *See id.* (stating courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, filing such payment"); *see also In re Penn Central Transp. Co.*, 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of business until their pre-reorganization claims have been paid"); *In re Just for Feet, Inc.*, 242 B.R. 821, 824-26 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtor may pay prepetition claims that are essential to continued operation of business); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

37. This "necessity of payment" doctrine provides a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Boston & Me. Corp.*, 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to pay claims for goods and services that are indispensably necessary the Debtor's continued operation). The doctrine is invoked early in a reorganization, particularly in connection with those chapter 11 transition issues that relate to the payment of prepetition claims. Indeed, it is not uncommon for courts in this Circuit and elsewhere to authorize the payment of prepetition claims where such payment is essential to the continued operations of the debtor. *See, e.g.*, *In re Verso Corp.*, Case No. 16-10163 (KG) (Bankr. D. Del. Jan. 27, 2016) (D.I. 93); *In re Swift Energy Co.*, Case No. 15-12670 (MFW) (Bankr. D. Del. Jan. 5, 2016) (D.I. 61).

38. Paying the Critical Vendor Claims that accrued before the Petition Date in the ordinary course of business is critical to the Debtor's efforts in this chapter 11 case and to maximize the value of the Debtor's business and maintain operations. Indeed, if this Motion is not granted, the Debtor's business would be drastically disrupted.

## SATISFACTION OF BANKRUPTCY RULE 6003

39. Pursuant to Rule 6003 of the Bankruptcy Rules, the Court may grant a request of a debtor to pay all or a part of a pre-petition claim in the first 21 days of a case only if that relief is necessary to avoid immediate and irreparable injury. For the reasons set forth herein, the Debtor submits that it has satisfied the requirements of Rule 6003 with respect to the relief requested in this Motion.

## **NOTICE**

40. Notice of this Motion has been given to (a) the Office of the United States Trustee; (b) the Debtor's twenty largest unsecured creditors; (c) the Debtor's secured creditor; and (d) the proposed stalking horse purchaser of the Debtor's assets pursuant to a sale motion filed contemporaneously herewith or to be filed. In light of the nature of the relief requested herein, Debtor submits that no other or further notice is required.

41. No previous request for the relief sought herein has been made to this Court or any other court.

[*Remainder of Page Intentionally Blank*]

WHEREFORE, the Debtor respectfully requests entry of Orders substantially in the form submitted contemporaneously herewith, granting the relief requested in the Motion, and such other and further relief as may be just and proper under the circumstances.

Dated:  May 2, 2017                           **BENESCH, FRIEDLANDER,**
                                                      **COPLAN & ARONOFF LLP**

                                                    */s/ Michael J. Barrie*
                                                    Michael J. Barrie (PA Bar No. 85626)
                                                    Jennifer R. Hoover (PA Bar No. 87910)
                                                    1650 Market Street, Suite 3628
                                                    Philadelphia, PA  19103
                                                    (267) 207-2947 (Telephone)
                                                    (267) 207-2949 (Facsimile)

                                                    *Proposed Counsel for the Debtor*
                                                    *and Debtor in Possession*