IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| BLEACHER CREATURES, LLC, | : | Case No. 17-13162 (JKF) |
|  | : |  |
| Debtor.[1] | : |  |
|  | : |  |

**MOTION OF THE DEBTOR AND DEBTOR IN POSSESSION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO INCUR POSTPETITION SECURED INDEBTEDNESS; (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Bleacher Creatures, LLC, debtor and debtor in possession in the above-captioned case (the "Debtor"), hereby moves the Court for entry of interim and final orders (i) authorizing the Debtor to incur postpetition secured indebtedness (the "DIP Loan") in accordance with the terms and conditions of the debtor in possession financing agreement attached hereto as Exhibit A (the "DIP Agreement");[2] (ii) authorizing the Debtor to use cash collateral; (iii) granting adequate protection to the Debtor's prepetition secured creditor on the terms and conditions specified below; (iv) scheduling a final hearing on the relief requested herein; and (v) granting related relief (the "Motion"). In support of this Motion, the Debtor respectfully represents as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The last four digits of the Debtor's federal tax identification number are (4547). The principal place of business of the Debtor is 527 Plymouth Road, Suite 407, Plymouth Meeting, Pennsylvania 19462.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Agreement.

10119100

3. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

**BACKGROUND**

I. **Overview of the Debtor's Business.**

4. The Debtor is a Delaware limited liability company with its principal place of business in Plymouth Meeting, Pennsylvania. The Debtor was formed in 2011.

5. The Debtor is in the business of manufacturing, distributing, and selling plush toys that resemble popular athletes, sports mascots, public figures, and characters from movies, comics, and other popular media. The Debtor sells most of its products under licenses from organizations such as Major League Baseball, the National Football League, the National Basketball Association, the National Hockey League, Disney, Marvel Comics, and DC Comics, among others. Certain of its products, including likenesses of historical figures and individuals in the public domain, are able to be sold without a license.

6. The Debtor engages factories located in China to manufacture its products, and employs shippers and logistics companies to transport finished goods either directly to the customer or to be warehoused in California pending their sale. The Debtor sells its products in the United States and internationally. The Debtor derives most of its revenue from wholesaling its products to retailers such as Target, Toys "R" Us, and Sears, among others, who re-sell the products to consumers. Additionally, approximately 4% of the Debtor's sales are direct-to-consumer sales through the Debtor's online sales platforms. The primary end consumers of the Debtor's products are children and memorabilia collectors.

**II.     The Debtor's Need for Protection Under Chapter 11 of the Bankruptcy Code.**

7. Like other companies that depend ultimately upon retail sales, the Debtor has faced numerous obstacles recently. First, the general difficulties of the current challenging retail market have been compounded by the terms of certain of the Debtor's licenses, which require the Debtor to make minimum guaranteed payments to certain licensors, irrespective of actual sales of the licensed product. At the same time, certain of the Debtor's licensors recently prohibited the Debtor from selling their licensed products on Amazon.com, which had historically proven to be a lucrative sales platform for the Debtor. These pressures have caused the Debtor to experience significant liquidity constraints for well over a year.

8. Additionally, beginning in 2014, the Debtor attempted to expand its direct-to-consumer sales through the use of mall kiosks. This strategy did not result in the sales volume the Debtor had expected, while at the same time burdening the Debtor with additional expenses.

9. Due to these issues, among others, the Debtor began exploring strategic alternatives in January 2016. The Debtor engaged Gregory Weinberg of GMW Organization, LLC ("GMW") as its investment banker to market a potential sale, merger, or other transaction that would maximize the going concern value of the Debtor's business. From February through May of 2016, GMW contacted approximately 10 potential counterparties. Those contacts resulted in meetings or calls with no less than six potential strategic partners. Each of these six parties entered into nondisclosure agreements, and certain entered into prolonged discussions, but none entered into a transaction. Around May 2016, however, the Debtor experienced an upward trend in sales, which prompted a current investor and member of the Debtor's board, Arrow Promotional Group, LLC ("Arrow"), to make a $200,000 unsecured loan to the Debtor in an effort to stabilize the business.

10. Despite the brief turnaround, the Debtor's sales began to decline in October 2016, and the Debtor required additional liquidity. That month, the Debtor's management proposed a merger of the Debtor and Pangea Brands (an affiliate of Arrow) to capture certain synergies and cost savings that a combined entity could expect to realize. The proposed merger did not come to fruition.

11. Sales continued to decrease, producing poor results for the fourth quarter of 2016. Following the failed merger with Pangea, the Debtor worked to identify investment and sale opportunities with existing investors. Again, nothing materialized, due in part to the Debtor's poor fourth quarter performance.

12. In January 2017, the Debtor's management recommended to the board that the Debtor should cease operations by the end of February 2017 unless new capital could be raised or a merger with Pangea Brands approved. In response, the Debtor's board voted to approve a merger with Pangea, subject to certain conditions and the receipt of approvals from certain licensors. Although the Debtor and GMW made significant efforts to satisfy such conditions and obtain the necessary approvals, these prerequisites for closing the merger have not been met, and the merger has been put on hold and is highly unlikely to close.

13. In March of 2017, the Debtor declined to renew its licenses with Marvel and the NFL because the Debtor lacked sufficient capital to pay the approximately $200,000 in advance payments due on renewal.

14. Throughout March and April of 2017, the Debtor laid off a significant portion of its workforce in an effort to reduce costs.

15. In late April 2017, Arrow—the investor and board member who made a $200,000 unsecured loan to the Debtor approximately a year ago—proposed a transaction in which a

newly formed entity, Bleacher Acquisition, LLC (the "Stalking Horse"), would acquire certain of the Debtor's assets and assume certain of the Debtor's liabilities through a sale under section 363 of the Bankruptcy Code.  Arrow asked that the Debtor's current President, Matthew S. Hoffman, participate as an equity holder in the Stalking Horse and serve as an executive of the post-bankruptcy acquiring entity, should the Stalking Horse's offer prevail as the highest and best offer for the Debtor's assets at a final hearing on the Debtor's sale motion.

16. Around the same time, at the direction of the Debtor's management, GMW re-canvassed the market for potential third-party buyers, merger partners, or investors who might provide the Debtor with the capital necessary to continue as a viable going concern.  GMW contacted approximately five parties.  To date, no third party has proposed transaction likely to yield more return for the Debtor's creditors than the offer of the Stalking Horse.

17. The Debtor commenced the above-captioned chapter 11 case on May 2, 2017 (the "Petition Date").  The purpose of this case is to permit the Debtor's business to continue as a viable going concern while the Debtor attempts to consummate a sale transaction, either to the Stalking Horse or to any other purchaser who may present a higher or better offer for the Debtor's assets.

18. The Debtor continues to operate its business and manage its assets as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

19. To date, no trustee or official committee of unsecured creditors has been appointed or designated by the Office of the United States Trustee.

**III.  The Debtor's Prepetition Secured Debt.**

20. In the ordinary course of its business before the Petition Date, the Debtor funded its cash needs through general operating revenues and a revolving line of credit in the principal amount of $250,000 (the "Line of Credit") from Beneficial Mutual Savings Bank ("Beneficial").

5

The Line of Credit is evidenced by that certain Commercial Loan Agreement between the Debtor and Beneficial dated July 11, 2014, and that certain Promissory Note dated July 11, 2014. As of the Petition Date, the Debtor had borrowed the maximum principal amount available under the Line of Credit, and such amount remains outstanding.

21.  The Debtor's obligations under the Line of Credit are secured pursuant to a Security Agreement between the Debtor and Beneficial dated July 11, 2014 (the "Security Agreement"). Subject to the terms of the Security Agreement, the Line of Credit is secured by a lien in the Debtor's (i) inventory and (ii) accounts receivable and other rights to payment of a monetary obligation (excluding (a) rights to payment evidenced by chattel paper or an instrument; (b) commercial tort claims; (c) deposit accounts; (d) investment property; (e) letter-of-credit rights or letters of credit or rights to payment; and (f) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card) and the products and proceeds thereof.

22.  Additionally, the Line of Credit is secured by guarantees given by (i) Matthew S. Hoffman (President, Manager, and Member of the Debtor and investor in the DIP Lender (defined below)); (ii) Margaret Guthart Strauss (affiliated with Arrow Promotional Group, LLC); and (iii) Arrow Promotional Group, LLC (Member of the Debtor with a right to designate a Manager, and investor in the DIP Lender).

23.  The Debtor's most recent financial statements (filed with its petition) reflect that the Debtor's current inventory is valued at approximately $783,000. The Debtor's most recent financial statements also reflect that the Debtor has current accounts receivable of approximately $575,000. Accordingly, the collateral for Beneficial's $250,000 Line of Credit is worth approximately $1.35 million, excluding the value of the guarantees.

24. To the extent that Beneficial holds a valid, perfected, and enforceable security interest in the Debtor's cash collateral, the Debtor requests authorization to use such cash collateral to fund its operations.

25. It is essential to the continued operation of the Debtor's business that it obtain the use of cash collateral in its ordinary course day-to-day operations. Without the immediate use of cash collateral, the Debtor lacks sufficient liquidity to maintain its operations. Accordingly, the Debtor risks immediate and irreparable harm to its business without access to cash collateral.

**IV.     The DIP Loan, DIP Agreement, and Concise Statement Pursuant to Bankruptcy Rule 4001.**

26. As reflected in the Debtor's most recent financial statements, the vast majority of the Debtor's assets are comprised of inventory and accounts receivable. Although the Debtor expects to liquidate such assets in the ordinary course of business in amounts sufficient to fund operating expenses, without access to the Beneficial Line of Credit, the Debtor requires an additional source of liquidity to ensure its ability to continue operations. Additionally, the Debtor requires funds to administer this chapter 11 case. Accordingly, the Debtor made the decision to enter into the DIP Loan with Bleacher Acquisition, LLC (the "DIP Lender"), to fund certain administrative costs of the Debtor's chapter 11 bankruptcy case and provide a source of funds to carry on the Debtor's operations during this chapter 11 case in the event that the Debtor is not able to fund operations through revenues generated during the bankruptcy case. Specifically, the proceeds of the DIP Loan will be used to satisfy the administrative costs of the Debtor's professionals and United States Trustee fees incurred during the course of the Debtor's chapter 11 case, and for such other purposes as the DIP Lender may permit in accordance with a budget that is attached to the DIP Agreement and incorporated by reference (the "Budget"). Additionally, funds made available under the DIP Loan will be used to pay off the Beneficial

7

Line of Credit, so as to facilitate and streamline the confirmation of a chapter 11 plan in this case.

27. The principal terms of the proposed DIP Loan are set forth in the chart below, and are also set forth on the DIP Agreement attached hereto as Exhibit A. The terms were negotiated in good faith by the Debtor and the DIP Lender and the terms are necessary to provide the Debtor with the needed liquidity to allow the Debtor to complete the chapter 11 plan process.

| Borrower: | The Debtor

DIP Agreement at Preamble. |
|---|---|
| Lender: | Bleacher Acquisition LLC, a newly formed entity owned and controlled by certain officers, directors, and members of the Debtor.

DIP Agreement at Preamble. |
| DIP Loan: | A secured term loan in an amount not to exceed $300,000 to fund the costs of the administration of the chapter 11 case, satisfy the claim of Beneficial, and provide working capital, as projected in the Budget. The Debtor seeks to access $25,000 of the DIP Loan on an interim basis.

DIP Agreement § 1.1. |
| Interest: | LIBOR plus 2.5%

DIP Agreement § 1.2. |
| Maturity Date: | The earlier of (i) three months following the Petition Date; (ii) the date of acceleration of any outstanding borrowings under the Loan pursuant to an Event of Default; (iii) the closing date of the sale of the Debtor's assets; or (iv) the date the Debtor abandons the proposed sale of the Debtor's assets or the sale process is otherwise terminated.

DIP Agreement § 1.8. |
| Events of Default: | Events of default include (i) failure to make payments when due; (ii) failure to perform covenants; (iii) false or misleading representations in the DIP Agreement; (iv) failure to obtain a final order of this Court approving the DIP Loan within 30 days of the Petition Date; |

| | |
|---|---|
| | (v) failure to remain in compliance with the Budget; (vi) dismissal or conversion to chapter 7 of the Debtor's bankruptcy case; (vii) appointment of a chapter 11 trustee or examiner with expanded powers in the Debtor's bankruptcy case; (viii) failure to file within three days of the Petition Date a motion to approve the sale of the Debtor's assets to the DIP Lender subject to higher or otherwise better offers; (ix) the filing of a chapter 11 plan without prior written consent of the DIP Lender; (x) the Debtor or any party engaging in or supporting any challenge to the validity, perfection, priority, extent, or enforceability of the DIP Lender's liens on or security interests in Collateral; (xi) the allowance of any claim or claims undersection 506(c) of the Bankruptcy Code against or with respect to any collateral of the DIP Lender; (xii) the Debtor abandons the proposed sale of the Debtor's assets, or the sale is otherwise terminated without the DIP Lender's prior written consent, or the Debtor seeks to sell all or substantially all of its assets and such sale does not provide for the payment in full in cash of the DIP Loan; and (xiii) the maturity date occurs.<br><br>DIP Agreement § 7.1. |
| Borrowing Conditions/Conditions Precedent: | The DIP Loan is subject to the following conditions precedent: (i) each and all of the representations and warranties set forth in section 2 of the DIP Agreement shall be true and correct in all respects as though separately and independently made on and as of the date of each advance of Loan proceeds; (ii) each and all of the covenants set forth in section 3 of the DIP Agreement shall have been performed and complied with in all respects; (iii) there shall be no Event of Default; (iv) the Loan Documents shall have been duly executed on behalf of Borrower and delivered to Lender and, where applicable, shall have been recorded or filed in the appropriate public office; (v) the following documents shall have been delivered by or on behalf of the Debtor to the DIP Lender: (a) evidence that all insurance pursuant to section 3.7 of the DIP Agreement is in place, and (b) such other documents as may be required to evidence and secure the DIP Loan or as may be required by the DIP Lender to comply with the terms of the DIP Agreement or of any Loan Document or to comply with the requirements of regulatory authorities to which the DIP Lender is subject; and (vi) this Court shall have entered one or more order(s) in a form satisfactory to the DIP Lender and the Debtor authorizing the Debtor to enter into and perform under the DIP Agreement, obtain the DIP Loan, and grant the DIP Lender a security interest in the Collateral.<br><br>DIP Agreement § 4. |

9

| | |
|---|---|
| Grant of Priority or Lien on Property of the Estate under section 364(c): | The DIP Loan shall be secured by (i) an administrative claim with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code; (ii) a first priority, postpetition lien on all property of the estate that is not otherwise subject to a lien; and (iii) a junior postpetition lien on all property of the estate that is subject to a valid, fully perfected lien (the "DIP Liens").  Notwithstanding anything in the DIP Agreement to the contrary, the DIP Liens shall be subordinate to the Carve-Out for allowed fees and expenses of the Debtor's professionals and United States Trustee fees not to exceed $100,000 in the aggregate.<br><br>DIP Agreement §§ 1.4, 1.5, 1.6. |
| Indemnification: | The Debtor, for itself and all those claiming under or through it, agrees to protect, indemnify, defend, and hold harmless the DIP Lender, its directors, officers, employees, and attorneys, agents and representatives, from and against any and all liability, expense, or damage or any kind or nature and from any suits, claims, or demands, including legal fees and expenses, arising out of the DIP Agreement or the Loan Documents or in connection therewith except for claims arising under the DIP Agreement or the Loan Documents or resulting directly from Lender's gross negligence or willful misconduct.<br><br>DIP Agreement § 6. |
| Release, waiver, or limitation of any right under 11 U.S.C. § 506(c): | The allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any of the Collateral is an Event of Default.<br><br>DIP Agreement § 7.1(l). |

**RELIEF REQUESTED**

28.    By this Motion, the Debtor seeks entry of an interim order (attached hereto as Exhibit B) and final order (attached hereto as Exhibit C) (i) authorizing the Debtor to use cash collateral, as that term is defined in 11 U.S.C. § 363(a) ("Cash Collateral"), (ii) authorizing the Debtor to enter into the DIP Agreement and obtain the DIP Loan upon the terms therein; (iii) granting adequate protection to Beneficial, and (iv) scheduling a final hearing on the relief requested herein.

10

**BASIS FOR RELIEF**

**I.   The Use of Cash Collateral is Appropriate Because Beneficial Is Oversecured and Proceeds of the DIP Loan will be Used to Satisfy Beneficial's Claim.**

29. The Court should authorize the Debtor to use Cash Collateral in accordance with the terms of this Motion and the Budget. Beneficial is adequately protected because, as described herein, Beneficial is substantially oversecured. Further, proceeds of the DIP Loan will be used to satisfy Beneficial's claim.

30. Section 363(c)(2) of the Bankruptcy Code prohibits a debtor's use of cash collateral unless (i) the party having an interest in the cash collateral consents, or (ii) the Court authorizes such use in accordance with section 363. 11 U.S.C. § 363(c)(2).

31. Section 363(e) of the Bankruptcy Code provides that, upon request of a party having an interest in Cash Collateral, the Court shall prohibit or condition the use of Cash Collateral "as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).

32. Adequate protection can be provided in a number of ways, the focus of which is to protect a secured creditor from diminution in value of its interest in the collateral during the period of use. *See, e.g.*, *Delbridge v. Prod. Credit Ass'n & Fed. Land Bank*, 104 B.R. 824, 827-28 (E.D. Mich. 1989); *In re Kain*, 85 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Becker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). Section 361 of the Bankruptcy Code provides three non-exclusive examples of what may constitute adequate protection:  (i) periodic payments; (ii) additional or replacement liens; and (iii) such other relief as will result in the realization of the "indubitable equivalent" of the entity's interest. *See* 11 U.S.C. § 361. Generally speaking, a prepetition lender is to be provided with the same level of protection it enjoyed prepetition since it is entitled to retain the benefit of its pre-bankruptcy bargain. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994). However, "[t]here may be

situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws.  Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest." *In re Briggs Trans. Co.*, 780 F.2d 1339, 1344 (8th Cir. 1986) (internal citations omitted).  Accordingly, what constitutes adequate protection is determined on a case-by-case basis. *See In re Swedeland*, 16 F.3d at 564; *In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. 1987).  "It is expected that the courts will apply the concept in light of the facts of each case and general equitable principles." *In re Briggs Trans. Co.*, 780 F.2d at 1344.

33.    Here, Beneficial is adequately protected because it enjoys a substantial equity cushion.  *See In re Hinchcliffe*, 164 B.R. 45, 49 (Bankr. E.D. Pa. 1994) (discussing that the various forms of adequate protection include, among other things, an equity cushion).[3]  When determining whether an equity cushion exists, consideration must be given to all of the secured party's collateral.  *See, e.g.*, *In re Am. Sweeteners, Inc.*, 1999 WL 1068446, *4 n.10 (Bankr. E.D. Pa. 1999) (considering value of all collateral in determining adequate protection in context of stay relief); *see also In re Diaconx*, 69 B.R. 333 (E.D. Pa. 1987) (looking to value of guaranty to determine amount of creditor's equity cushion); *In re Indus. Valley Refrig. & Air Conditioning Supp., Inc.*, 77 B.R. 15 (Bankr. E.D. Pa.) (permitting use of cash collateral where equity in debtor's property and non-debtor collateral created sufficient equity to provide adequate protection).  An equity cushion sufficient in size and unlikely to erode "can constitute adequate protection" on its own.  *In re Sharon Steel Corp.*, 159 B.R. 165 (Bankr. W.D. Pa. 1993).

---

[3]    "To prove adequate protection, a debtor can argue that a sufficient equity cushion exists in the creditor's collateral to protect the creditor's interest during the bankruptcy case.  Alternatively…while the list of adequate protection examples is not exhaustive, in the proper case, a debtor could rely upon his arguably high prospects for a successful reorganization to support his claim that adequate protection exists." *In re Hinchcliffe*, 164 B.R. at 49.

34. As explained above, the Debtor's most recent financial statements, filed with the petition, reflect that Beneficial is oversecured by over $1.1 million. Specifically, Beneficial's $250,000 Line of Credit is secured by the Debtor's inventory and accounts receivable. The Debtor's current inventory is valued at approximately $783,184, and the Debtor has current accounts receivable of approximately $575,238. Accordingly, the collateral for Beneficial's $250,000 Line of Credit is worth approximately $1.35 million. Additionally, Beneficial's Line of Credit is secured by third-party, non-debtor guarantees.

35. Beneficial is further adequately protected because proceeds of the DIP Loan are budgeted to be used to satisfy Beneficial's secured claim. Beneficial can rest assured, therefore, that even in the highly unlikely event that its substantial equity cushion erodes during what is expected to be a relatively short chapter 11 process, the Debtor has made provisions to satisfy Beneficial's secured claim.

36. Accordingly, the Court should authorize the Debtor's use of the Cash Collateral because Beneficial is adequately protected.

## II.     The DIP Loan Should Be Approved.

37. The Debtor also submits that the DIP Loan should be approved.

38. Section 364 authorizes a debtor, subject to court approval, to incur secured postpetition debt. Specifically, section 364(c) provides:

> If the [debtor in possession] is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

13

> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

39. Courts have articulated a three-part test to determine whether a debtor may obtain financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether: (a) the debtor is unable to obtain unsecured credit under by allowing a lender only an administrative claim; (b) the credit transaction is necessary to preserve the assets of the estate; and (c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan because it "reflect[ed] sound and prudent business judgment on behalf of TWA ... [was] reasonable under the circumstances and in the best interest of TWA and its creditors."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); *In re The Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

40. Moreover, a bankruptcy court will generally respect a debtor in possession's business judgment regarding postpetition loan transactions. As one court has noted:

> A court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest.

*In re Ames*, 115 B.R. at 40; *see also Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (authorizing debtor to obtain loan under section 364 of the Bankruptcy Code where the loan is an exercise of sound business judgment).

41. With respect to the first prong of the three-part test, a debtor need only demonstrate "by a good faith effort that credit was not available" without the protections of section 364(c) of the Bankruptcy Code. *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir.

14

1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Here, the financing provided under the terms of the DIP Agreement is the only feasible postpetition financing available to the Debtor. The Debtor is not aware of any lender willing to advance funds based solely on the grant of an administrative claim in its bankruptcy case. As a result, "it would be unrealistic and unnecessary to require [the debtor] to conduct… an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Ames*, 115 B.R. at 40. Thus, the Debtor submits that the requirement that alternative credit on more favorable terms be unavailable to the Debtor is satisfied.

42. The second prong—whether the credit transaction is necessary to preserve the assets of the estate—is also met here. The financing provided under the DIP Loan is necessary because it provides the Debtor with the needed liquidity to satisfy the postpetition administrative expenses incurred in the chapter 11 case and, to the extent necessary, fund its operations in the ordinary course, pursuant to the Budget. Further, the DIP Loan provides funds to pay off the Beneficial Line of Credit, thereby enhancing the likelihood that the Debtor will be able to present a confirmable chapter 11 plan on a suitable timeframe. The DIP Loan is thus in the best interests of the estate and necessary to preserve the going concern value of the Debtor.

43. Finally, the Debtor negotiated the DIP Loan at arm's length and has determined, in the exercise of its sound business judgment, that it is the best proposal under the circumstances and that its terms are fair and reasonable. The Debtor believes that the terms of the DIP Loan are reasonable and in the best interests of the Debtor's estate, because it will facilitate a chapter 11 process designed to maximize the value of the Debtor's assets and provide the opportunity for a meaningful return to general unsecured creditors.

44.     For these reasons, the Debtor respectfully requests that the Court authorize the Debtor to obtain the DIP Loan on the terms of the DIP Agreement.

### III.     The DIP Lender Is Entitled to the Protections of Section 364(e) of the Bankruptcy Code.

45.     Section 364(c) of the Bankruptcy Code provides that the "reversal or modification on appeal of an authorization… to obtain credit or incur debt… does not affect the validity of any debt so incurred or any priority or lien so granted, to an entity that extended such credit in good faith." 11 U.S.C. § 364(c).  As previously discussed herein, the DIP Loan is the product of arm's length, good faith negotiations between the Debtor and the DIP Lender.  Moreover, the terms and conditions of the DIP Facility are fair and reasonable, and in the best interests of their estates and creditors.  Accordingly, the Debtor respectfully submits that the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code, and is entitled to all of the protections afforded by that section.

### IV.     Expedited Consideration of the Motion Is Necessary to Prevent Immediate and Irreparable Harm.

46.     The Debtor requests that the Court conduct an expedited preliminary hearing with respect to this Motion and schedule a final hearing at the earliest possible date in accordance with Fed. R. Bankr. P. 4001(b) and (c).

47.     Under Rule 4001 of the Bankruptcy Rules, a final hearing on a debtor's motion to authorize use of Cash Collateral or obtain credit may not be commenced earlier than 14 days after service of the motion.  Fed. R. Bankr. P. 4001(b)(2), (c)(2).  Upon request, however, the Court may conduct a preliminary, expedited hearing on such a motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.  Fed. R. Bankr. P. 4001(b)(2), (c)(2).

48. As noted above, the Debtor has an urgent and immediate need to use Cash Collateral and the DIP Loan to continue operating its business. As reflected on the Budget, without immediate access to Cash Collateral and DIP Loan—which are the sole source of funding for the Debtor's operations—the Debtor cannot pay current and ongoing operating expenses such as postpetition wages and salaries and necessary vendor products and services. Consequently, the use of the Cash Collateral and access to the DIP Loan on an immediate and interim basis is required to avoid irreparable harm that will jeopardize any prospect for a successful reorganization. As reflected in the Budget, the Debtor requests to borrow only $25,000 under the DIP Loan on an interim basis.

49. In order to avoid immediate and irreparable harm to the Debtor's estate pending a final hearing on this Motion, the Debtor requires the use of Cash Collateral and access to the DIP Loan for an approximate three week interim period to pay, among other things, payroll, utilities, and other ordinary business costs and expenses in accordance with the Budget.

## **NOTICE**

50. Notice of this Motion has been given to (a) the Office of the United States Trustee; (b) the Debtor's twenty largest unsecured creditors; (c) the Debtor's secured creditor; and (d) the proposed DIP Lender and stalking horse purchaser of the Debtor's assets pursuant to a sale motion filed contemporaneously herewith. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

51. No previous request for the relief sought herein has been made to this Court or any other court.

[*Remainder of Page Intentionally Blank*]

WHEREFORE, the Debtor respectfully requests that this Court enter interim and final orders, substantially in the form annexed hereto, (i) authorizing the Debtor's use of Cash Collateral; (ii) approving the DIP Agreement and authorizing the Debtor to obtain the DIP Loan; (iii) scheduling a final hearing on this Motion, and (iv) granting such other and further relief as is just and proper under the circumstances.

Dated:  May 3, 2017    **BENESCH, FRIEDLANDER,**
　　　　　　　　　　　　　　　**COPLAN & ARONOFF LLP**

　　　　　　　　　　　　　　　 */s/ Michael J. Barrie*
　　　　　　　　　　　　　　　Michael J. Barrie (PA Bar No. 85626)
　　　　　　　　　　　　　　　Jennifer R. Hoover (PA Bar No. 87910)
　　　　　　　　　　　　　　　1650 Market Street, Suite 3628
　　　　　　　　　　　　　　　Philadelphia, PA  19103
　　　　　　　　　　　　　　　(267) 207-2947 (Telephone)
　　　　　　　　　　　　　　　(267) 207-2949 (Facsimile)

　　　　　　　　　　　　　　　*Proposed Counsel for the Debtor*
　　　　　　　　　　　　　　　*and Debtor in Possession*